# Exhibit A

# *Entropic Communications, LLC v. Cox Communications, Inc. et al.*
# Hearing on Motions to Dismiss Cox's Counterclaims

Case No. 2:23-cv-1043-JWH-KES

Related Case No. 2:23-cv-1047-JWH-KES

1

# The Obligations Under the IPR Policy

547. Consistent with the limited disclosure of approved Draft Deliverables, the IPR Policy also included various clauses requiring Alliance Parties to hold the relevant necessary patents and other intellectual property and anti-circumvention clauses to enforce such requirements. First, the IPR Policy specified that "Intellectual Property" referenced the intellectual property, including patents, "necessary to use, make," etc. the technologies to be implemented under the various draft and approved Deliverables. Exhibit A, Definitions. Section 4.1.1 required that such Intellectual Property be owned by either "the Alliance Party(ies) who developed the Intellectual Property or by the Alliance Party(ies) to whom the Intellectual Property was properly and legally assigned." In all cases, however, as to any necessary patents, the IPR Policy required that any such essential patents shall be owned by an "Alliance Party."

548. Second, under Section 4.1.2, the Alliance Parties promised that each would always maintain the right to grant the required licenses under the IPR Policy. MaxLinear represented, warranted, and covenanted that it had the power and authority to bind itself to the IPR policy, and the relevant obligations therein, including to grant patent licenses. MaxLinear also "further represents and warrants and agrees that it has not and will not intentionally transfer or otherwise encumber its patents or patent applications that reasonably may contain or result in Essential Patent Claims for the purpose of circumventing the obligation to grant licenses contained in this IPR Policy." Exhibit A, at § 4.1.2.

549. The IPR Policy specified that any transfer of patents with essential claims to unaffiliated third parties required alliance parties like MaxLinear to ensure that such transfers were made subject to the IPR Policy. That obligation required, at minimum, that "any agreement for transferring or assigning ... any patent or patent application that reasonably may contain or result in an Essential Patent Claim, includes a provision that such transfer or assignment is subject to existing licenses and obligations to license imposed on the Alliance Party by this Agreement and the Alliance Bylaws" under the IPR Policy. Exhibit A, at § 5.1.2.

550. Thus, the IPR Policy required that MaxLinear, as an Alliance Party, either own the relevant patents or retain the right to grant any licenses for essential patents via multiple provisions that addressed access to the relevant confidential standards, development and ownership of the relevant Intellectual Property, and ongoing obligations to ensure Alliance Parties retained relevant licensing rights.

DE 276, ¶¶ 547-50.

# The Obligations Under the IPR Policy

> 5.1.1 **Limited Obligation to License Essential Patent Claims**. Subject to the terms in this IPR Policy, following Board of Director approval of an Approved Draft Deliverable and upon the written request of any other then-current Alliance Party, each Alliance Party agrees to offer and attempt to negotiate a license to the requesting Alliance Party(ies), under the terms of a separate written agreement, such Alliance Party's and its Affiliates' Essential Patent Claims to the extent necessary to use, make, have made, offer for sale, sell and import Fully Compliant Products in conformance with or as described in such Approved Draft Deliverable. Such licenses shall be non-exclusive, worldwide, and on fair, reasonable and nondiscriminatory terms and conditions (collectively, "*RAND*") which may include defensive suspension provisions and may be subject to reciprocity as set forth in Section 5.1.3. Each Alliance Party (on behalf of itself and its Affiliates) hereby agrees that it shall not seek an injunction and hereby waives its rights to an injunction with respect to infringement of the Alliance Party's Essential Patent Claims by Fully Compliant Products against any other Alliance Parties that are entitled to receive a RAND license as described in this Section. Such waivers of injunctive relief shall not prohibit the waiving Alliance Party from seeking or receiving […]

> 5.1.1 **Limited Obligation to License Essential Patent Claims**. Subject to the terms in this IPR Policy, following Board of Director approval of an Approved Draft Deliverable and upon the written request of any other then-current Alliance Party, each Alliance Party agrees to offer and attempt to negotiate a license to the requesting Alliance Party(ies), under the terms of a separate written agreement, such Alliance Party's and its Affiliates' Essential Patent Claims to the extent necessary to use, make, have made, offer for sale, sell and import Fully Compliant Products in conformance with or as described in such Approved Draft Deliverable. Such licenses shall be non-exclusive, worldwide, and on fair, reasonable and nondiscriminatory terms and conditions (collectively, "*RAND*") which may

> 7.1 **Termination of the Applicable Agreement**. If an Alliance Party's membership or participation in the Alliance terminates or expires for any reason, then (i) the terminated Alliance Party shall be entitled to request or require any Alliance Party to license such Alliance Party's Essential Patent Claims under Section 5.1 (RAND Licenses), but only to the extent necessary to use, make, have made, offer for sale, sell and import Fully Compliant Products in conformance with or as described in Draft Deliverables or Approved Draft Deliverables approved by the Board of Directors prior to such expiration or termination; and (ii) the terminated Alliance Party shall no longer be entitled to request or require any Alliance Party to license such Alliance Party's Essential Patent Claims to the terminated Alliance Party as provided in Sections 5.1 (RAND Licenses) to any extent with regard to Fully Compliant Products in conformance with or as described in Draft Deliverables or Approved Draft Deliverables approved by the Board of Directors after such expiration or termination; and (iii) the terminated Alliance Party and its Affiliates shall, after such termination, continue to offer and to license to any other Alliance Parties the terminated Alliance Party's (and its Affiliates') Essential Patent Claims as provided in Sections 5.1 (RAND Licenses), including Alliance Parties that become Alliance Party after such termination. The terminated Alliance Party's obligations under (iii) above shall only apply to Essential Patent Claims that are required to use, make and sell Fully Compliant Products described in or covered by Approved Draft Deliverables approved by the Board of Directors prior to such expiration or termination. The terminated Alliance Party's obligations under (iii) above shall not apply to Essential Patent Claims that are required to use, make and sell Fully Compliant Products described in Draft Deliverables approved by the Board of Directors as Approved Draft Deliverables after such expiration or termination, except as to portions of such Approved Draft Deliverable approved by the Board of Directors as a separate Approved Draft Deliverable prior to such termination or expiration (e.g., an earlier version of the Approved Draft Deliverable).

> 7.1 **Termination of the Applicable Agreement**. If an Alliance Party's membership or participation in the Alliance terminates or expires for any reason, then (i) the terminated Alliance Party shall be entitled to request or require any Alliance Party to license such Alliance Party's Essential Patent Claims under Section 5.1 (RAND Licenses), but only to the extent necessary to use, make, have made, offer for sale, sell and import Fully Compliant Products in conformance with or as described in Draft Deliverables or Approved Draft Deliverables approved by the Board of Directors prior to such expiration or termination; and

DE 96 (MoCA Intellectual Property Rights Policy ("IPR Policy")), §§ 5.1.1 (Page ID #:1767), 7.1 (Page ID #:1769); DE 276 (Amended Counterclaims), ¶¶ 541, 547-49.

3

# The Obligations Under the IPR Policy

**4.1.1 Alliance Party Intellectual Property.** All right, title and interest in and to Alliance Party Intellectual Property shall be owned exclusively by the Alliance Party(ies) who developed the Intellectual Property or by the Alliance Party(ies) to whom the Intellectual Property was properly and legally assigned.

**4.1.2 Authority to Grant Licenses; No Attempt to Circumvent.** Each Alliance Party represents, warrants and covenants to the Alliance and to other Alliance Parties that it has the power and authority to bind itself and all of its Affiliates to the obligations contained herein, including without limitation, the obligation to grant patent licenses as set forth in this IPR Policy. Each Alliance Party further represents and warrants and agrees that it has not and will not intentionally transfer or otherwise encumber its patents or patent applications that reasonably may contain or result in Essential Patent Claims for the purpose of circumventing the obligation to grant licenses contained in this IPR Policy. Each Alliance

**5.1.2 Transfer of Essential Patent Claims.** Any sale, assignment or other transfer by an Alliance Party or its Affiliates to an unaffiliated third party of an Essential Patent Claim, or any patent or patent application that reasonably may contain or result in an Essential Patent Claim, shall be made subject to the terms in this IPR Policy. An Alliance Party may choose the manner in which it complies with this Section 5.1.2, provided that any agreement for transferring or assigning Essential Patent Claims, or any patent or patent application that reasonably may contain or result in an Essential Patent Claim, includes a provision that such transfer or assignment is subject to existing licenses and obligations to license imposed on the Alliance Party by this Agreement and the Alliance Bylaws, and that the transferee will similarly include appropriate provisions in the event of future transfers with the goal of binding each successor-in-interest. Moreover, the licensing obligations under this IPR Policy are intended to be binding (*e.g.*, as encumbrances) on all successors-in-interest regardless of whether such provisions are included.

DE 96, §§ 4, 5.1.2 (Page ID #:1766-1767); *see also* DE 276, ¶¶ 547-48.

# The Obligations Under the IPR Policy

> 548. Second, under Section 4.1.2, the Alliance Parties promised that each would always maintain the right to grant the required licenses under the IPR Policy. MaxLinear represented, warranted, and covenanted that it had the power and authority to bind itself to the IPR policy, and the relevant obligations therein, including to grant patent licenses. MaxLinear also "further represents and warrants and agrees that it has not and will not intentionally transfer or otherwise encumber its patents or patent applications that reasonably may contain or result in Essential Patent Claims for the purpose of circumventing the obligation to grant licenses contained in this IPR Policy." Exhibit A, at § 4.1.2.

> 4.1.2 **Authority to Grant Licenses; No Attempt to Circumvent.** Each Alliance Party represents, warrants and covenants to the Alliance and to other Alliance Parties that it has the power and authority to bind itself and all of its Affiliates to the obligations contained herein, including without limitation, the obligation to grant patent licenses as set forth in this IPR Policy. Each Alliance Party further represents and warrants and agrees that it has not and will not intentionally transfer or otherwise encumber its patents or patent applications that reasonably may contain or result in Essential Patent Claims for the purpose of circumventing the obligation to grant licenses contained in this IPR Policy. Each Alliance

DE 276, ¶¶ 547-48; DE 96, §§ 4.1.1, 4.1.2 (Page ID #:1766-1767).

5

## The Obligations Under the IPR Policy

> 549. The IPR Policy specified that any transfer of patents with essential claims to unaffiliated third parties required alliance parties like MaxLinear to ensure that such transfers were made subject to the IPR Policy. That obligation required, at minimum, that "any agreement for transferring or assigning ... any patent or patent application that reasonably may contain or result in an Essential Patent Claim, includes a provision that such transfer or assignment is subject to existing licenses and obligations to license imposed on the Alliance Party by this Agreement and the Alliance Bylaws" under the IPR Policy. Exhibit A, at § 5.1.2.

> 5.1.2  **Transfer of Essential Patent Claims.**  Any sale, assignment or other transfer by an Alliance Party or its Affiliates to an unaffiliated third party of an Essential Patent Claim, or any patent or patent application that reasonably may contain or result in an Essential Patent Claim, shall be made subject to the terms in this IPR Policy. An Alliance Party may choose the manner in which it complies with this Section 5.1.2, provided that any agreement for transferring or assigning Essential Patent Claims, or any patent or patent application that reasonably may contain or result in an Essential Patent Claim, includes a provision that such transfer or assignment is subject to existing licenses and obligations to license imposed on the Alliance Party by this Agreement and the Alliance Bylaws, and that the transferee will similarly include appropriate provisions in the event of future transfers with the goal of binding each successor-in-interest. Moreover, the licensing obligations under this IPR Policy are intended to be binding (*e.g.*, as encumbrances) on all successors-in-interest regardless of whether such provisions are included.

DE 96, § 5.1.2 (Page ID #:1767); DE 276, ¶¶ 549-50.

# MoCA Deliverable Obligations

> 3.6  **Disclosure of Deliverables to Unrelated Parties.** Upon an additional Majority Vote of the Board of Directors, an Approved Draft Deliverable, or a portion thereof, may obtain the designation of a "Deliverable" to allow for disclosure to third parties that are not Alliance Parties or any of their Affiliates ("Unrelated Parties"). In such event, the Board of Directors shall, subject to the terms in this Section, determine the process, nature and scope of disclosure of the Deliverable to Unrelated Parties. Nothing in this IPR Policy shall require the Board of Directors to, and the Board of Directors may elect not to, disclose an Approved Draft Deliverable or any portion thereof to Unrelated Parties. Disclosure of an Approved Draft Deliverable or any portion thereof to Unrelated Parties shall require a Majority Vote of the Board of Directors. Any Alliance Party whose Confidential Information is included in a Deliverable hereby consents to such distribution to Unrelated Parties under the terms of this Section 3.6. If Confidential Information is included in the Deliverable or any portion thereof, then, the Board of Directors by such Majority Vote, and in its sole election, may or may not require the Unrelated Party enter into a confidentiality agreement with the Alliance. The Board of Directors may elect to pre-approve specific Unrelated Parties or groups of Unrelated Parties for distribution of Deliverables subject to the terms of this Section 3.6.

DE 96, § 3.6 (Page ID #:1766); *see also* DE 276, ¶¶ 544-46.

# MoCA Essentiality

> 563. Based on the averments in Plaintiff's Complaint and if Plaintiff's averments are substantiated, one or more of the Asserted Patents reasonably may contain essential patent claims such that the applicable patent(s) are subject to the IPR Policy. By way of example, Plaintiff's Complaint contains averments concerning the relevance of MoCA to the Asserted Patents, attaches as exhibits the Asserted Patents that discuss the MoCA standards, expressly identifies certain claims as essential, and/or references as exhibits claim charts that compare one or more claims within the Asserted Patents to the MoCA standards. *See also* ECF No. 1, at ¶¶ 109, 143, 177, 211, 245, 279, 313, 347, 381, 415, 449, 483.

> 564. Additionally, Plaintiff has claimed that it holds "a number of patents essential to compliance with foundational aspects of the Multimedia over Coax Alliance ("MoCA"), MAC/PHY Specifications ('MOCA Specifications')."[17] Plaintiff's correspondence further included a list of patents, which list includes the Asserted Patents.

> 579. Cox seeks a finding that, in view of MaxLinear's breaches, any agreement purporting to assign the asserted patents is void. Further, to the extent the Asserted Patents contain patent claims essential to the MoCA standard, Cox is entitled to receive an appropriate license on FRAND terms from MaxLinear, and only MaxLinear. Accordingly, Cox asks for equitable relief from the Court, including specific performance and injunctive relief to ensure that MaxLinear complies with the IPR Policy.

DE 276, ¶¶ 563-64, 579.

## MaxLinear's MoCA Benefits

We derive, and expect to continue to derive for the foreseeable future, a significant portion of our revenues from sales of our Connectivity solutions based on the MoCA standard. The market for multimedia content delivery solutions based on the MoCA standard is relatively new, still evolving and difficult to predict. Currently, the growth of the MoCA-based multimedia content delivery market is largely driven by the adoption and deployment of existing and future generations of the technology by service providers, ODMs and OEMs and, to a lesser extent, by consumer adoption of such technology which is dependent on upgrades from standard definition television services to high-definition television services, or HD services, and on the availability of over-the-top, or OTT, services that directly deliver Internet video content into the home. It is difficult to predict whether the MoCA standard will continue to achieve and sustain high levels of demand and market acceptance by service providers or consumers, the rate at which consumers will upgrade to HD services, whether the availability of OTT services will continue to grow or whether consumers beyond the early technology adopters will embrace OTT services in increasing numbers, if at all. Even if MoCA solutions continue to proliferate, it is difficult to anticipate the specifications and features that service providers will require for MoCA-based products purchased for their deployments. Failure to accurately make such predictions may have a material adverse effect on revenue and expense projections. Even if products incorporating our MoCA solutions are ultimately selected by service providers, the timing and speed of deployments of such products by service providers are subject to variables outside of our control which make it difficult to accurately predict revenues for any given period.

With regard to Connectivity solutions, some service providers, ODMs and OEMs have adopted, and others may adopt, multimedia content delivery solutions that rely on technologies other than the MoCA standard or may choose to wait for the introduction of products and technologies that serve as a replacement or substitute for, or represent an improvement over, MoCA-based solutions. The alternative technology solutions which compete with MoCA-based solutions include Ethernet, HomePNA, HomePlug AV and Wi-Fi. It is critical to our success that additional service providers, including telecommunications carriers, digital broadcast satellite service providers and cable operators, adopt the MoCA standard for home networking and deploy MoCA solutions to their customers. If the market for MoCA-based solutions does not continue to develop or develops more slowly than we expect, or if we make errors in predicting adoption and deployment rates for these solutions, our revenues may be significantly adversely affected. Our operating results may also be adversely affected by any delays in consumer upgrade to HD services, delays in consumer adoption of OTT services, or if the market for OTT services develops more slowly than we expect.

Many of these same market dynamics apply to STB SoCs which we acquired when we purchased the STB business from Trident Microsystems, Inc. and certain of its subsidiaries, collectively Trident, in 2012. The success of our STB solutions will depend on the adoption and deployment by service providers of the technologies and features offered by our STB SoC products. As with our Connectivity solutions, it is difficult to predict the levels of demand and market acceptance of our STB solutions, and therefore, it may be difficult to predict the timing and amount of future revenues from our STB SoC products.

https://www.sec.gov/Archives/edgar/data/1227930/000122793015000006/entr2014123110-k.htm; *see also* DE 276, ¶¶ 532-33.

## Entropic's Representations Concerning MoCA

> As a member of MoCA, we are required to license any of our patent claims that are essential to implement the MoCA specifications to other MoCA members on reasonable and non-discriminatory terms. As a result, we are required to license some of our important intellectual property to other MoCA members, including other semiconductor manufacturers that may compete with us in the sale of MoCA-compliant chipsets. Furthermore, there may be disagreements among MoCA members as to specifically which of our patent claims we are required to license to them. If we are unable to differentiate our MoCA-compliant chipsets from other MoCA-compliant chipsets by offering superior pricing and features outside MoCA specifications, we may not be able to compete effectively in the market for such chipsets. Moreover, although we are currently and actively involved in the ongoing development of the MoCA standard, we cannot guarantee that future MoCA specifications will incorporate technologies or product features we are developing or that our solutions will be compatible with future MoCA specifications. As additional members, including our competitors, continue to join MoCA, they and existing members may exert greater influence on MoCA and the development of the MoCA standard in a manner that is adverse to our interests. If our Connectivity solutions fail to comply with future MoCA specifications, the demand for these solutions could be severely reduced. Even if our MoCA products offer advanced features and compatibility with evolving MoCA standards, our competitors may offer solutions that integrate their MoCA with other desired functionality, or they may otherwise offer a more a more compelling value proposition to customers than we are able to offer with our limited range of MoCA products.

https://www.sec.gov/Archives/edgar/data/1227930/000122793015000006/entr2014123110-k.htm; *see also* DE 276, ¶¶ 532-33.

# *Entropic Communications, LLC v. Cox Communications, Inc. et al.*
# Hearing on Motions to Dismiss Cox's Counterclaims

Case No. 2:23-cv-1049-JWH-KES

Related Case No. 2:23-cv-1050-JWH-KES

# DOCSIS

283. CableLabs develops and publishes various specifications and standards, including the Data Over Cable Service Interface Specification ("DOCSIS"). Multiple entities participate in developing the specifications, which aim to benefit cable operators. For example, the DOCSIS 3.1 specification states that it "is the result of a cooperative effort undertaken at the direction of Cable Television Laboratories, Inc. for the benefit of the cable industry and its customers" and further explains in Section 1.1 that the "specification was developed for the benefit of the cable industry, and includes contributions by operators and vendors from North and South America, Europe, China and other regions."

286. The Contribution Agreement in the case of DOCSIS created a royalty-free pool for intellectual property rights essential to the DOCSIS standards. Specifically, companies that have signed a DOCSIS license agreement ("DOCSIS Licensors") granted CableLabs a non-transferable, worldwide, non-exclusive, royalty-free license, with the right to sublicense, to all current and future patents owned by the licensor or its affiliates essential for compliance with DOCSIS specifications. In return, DOCSIS Licensors obtained from CableLabs a non-transferable worldwide, non-exclusive, royalty-free license under all patents CableLabs had the right to license or sublicense to the extent necessary for compliance with the DOCSIS specifications.[5]

284. Vendors of cable equipment may participate in the development of CableLabs' specifications through a variety of processes.[3] By executing a confidentiality agreement, vendors can access non-public documents, including draft specifications, technical papers and documentation, software code, notices, and announcements. Any vendor with interest or expertise can also join the relevant working groups that develop the relevant specifications. As CableLabs explains, In order to facilitate widespread implementation of CableLabs Specifications, and reduce overall costs for Vendors, Cable Operators, and consumers, CableLabs has established Contribution Agreements (also referred to as IPR Agreements) for each family of CableLabs Specifications—DOCSIS (data), PacketCable (voice), and OpenCable (video). DPoE, EPOC, Metadata, and other projects also have similar Contribution Agreements. The Contribution Agreements provide Technology Vendors with either a royalty-free grant of necessary intellectual property, or a reasonable and non-discriminatory obligation to license necessary intellectual property, from all other Contributors, as the case may be per agreement. Likewise, to participate in the Working Group, a Vendor must make reciprocal commitments to all other Contributors by signing the Contribution Agreement.[4]

DE 194, ¶¶ 283, 284, 286; https://www.cablelabs.com/become-a-vendor/suppliers-how-to-engage#; https://www.cablelabs.com/blog/patents-and-licensing-why-it-matters; *see also* DE 194, ¶ 285.

## DOCSIS Essentiality

304. Based on the averments in Plaintiff's Complaint and if Plaintiff's averments are substantiated, one or more of the Asserted Patents are essential to compliance with the DOCSIS specifications. By way of example, Plaintiff's Complaint discusses and describes various items of cable equipment that are DOCSIS compliant, including cable modems and cable modem termination systems. Plaintiff's Complaint further references as exhibits charts that both compare one or more claims within the Asserted Patents to various DOCSIS compliant equipment provided by DOCSIS Licensors like ARRIS, Broadcom, Pace, Samsung and/or Technicolor, as well as reference various aspects of DOCSIS.

305. Plaintiff's averments directly implicate the DOCSIS specifications. For example, the '775 Patent concerns a cable modem system with a cable modem engine including a "DOCSIS controller" and a "DOCSIS MAC processor," each of which are addressed in DOCSIS. Plaintiff's accusations focus on DOCSIS-compliant cable modems, set top boxes, and other equipment as evidenced in Exhibit 2 of Plaintiff's Complaint. The '690 and '682 Patents relate to messaging and communications between a Cable Modem Termination System and a Cable Modem, which is addressed in DOCSIS and which items are addressed in Exhibits 4 and 12 of Plaintiff's Complaint.

306. Plaintiff has also provided its infringement contentions that rely upon DOCSIS-compliant equipment and/or DOCSIS functionalities. Based upon Plaintiff's averments in its Complaint, Plaintiff's infringement contentions and/or the DOCSIS specifications themselves, one or more claims from at least the '008, '826 and/or '690 Patents, are essential for compliance with the DOCSIS specifications. And, as to the '775 and '682 patents, at least in light of Plaintiff's contentions and because the '775 patent has claims specifically to DOCSIS components and the '682 patent claims messaging addressed in DOCSIS, each of those patents plausibly may contain one or more claims that are essential to DOCSIS.

307. Additionally, Plaintiff has claimed that it holds "patents essential to standards, in accordance with the applicable intellectual property rights policies of relevant standards bodies."[8] Plaintiff's correspondence further included a list of patents, which list includes the Asserted Patents.

DE 194, ¶¶ 304-307.

# DOCSIS Patent License Pool

288. The DOCSIS License Agreements were intended to benefit Cox, which could purchase and use manufactured products compliant with DOCSIS free of any patent claims.

289. Other vendors from which Cox purchases DOCSIS-compliant hardware and software are also DOCSIS Licensors. For example, Cox, or its customers, purchase and use equipment from Samsung Electronics Co., Systems, Inc ("Cisco"), and ARRIS Group, Inc., and/or their relevant predecessors and successors. These suppliers are signatories to the DOCSIS License Agreement, as demonstrated in Exhibit B, which is a true and correct copy of CableLabs' list of DOCSIS® IPR Agreement Signatories.

290. Cox's suppliers, in turn, purchase components from other DOCSIS signatories that supply systems on a chip, like Broadcom Corporation or Intel Corporation, who are also signatories to the DOCSIS License Agreement. The equipment Cox obtains or uses from these suppliers and DOCSIS Licensors complies with and/or is certified to comply with DOCSIS Specifications. MaxLinear, Inc. is also listed as a signatory to the DOCSIS License Agreements according to the publicly available DOCSIS® IPR Agreement Signatories, attached as Exhibit B.

DOCSIS® IPR Agreement Signatories

Arista Networks, Inc.
Arris (successor to LANcity/Bay Networks/Nortel)
Arris Interactive, LLC
ASUSTeK Computer Inc.
Broadband Management Solutions, LLC (successor to Stargus, Inc.)
Broadcom Corp.
Ciena Corporation
Cisco Systems Inc.
Coherent Logix Incorporated
Commscope (as successor in interest to LiquidxStream)
Maxim Integrated Products, Inc.
Maxlinear Inc.
MDI Telecom Corp. d/b/a SyncWorks
Open Text (for itself and as successor to Cordys, Inc.)
Pace Micro Technology Plc
Pacific Broadband Networks a/k/a PBN Global
Samsung Electronics Co., Ltd.
SARFT aka Academy of Broadcasting Planning
SCM Microsystems, Inc.

DE 194, ¶¶ 288-290; DE 87-2.