Exhibit F

Krishnan Padmanabhan (SBN: 254220)
kpadmanabhan@winston.com
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166
Telephone: (212) 294-6700
Facsimile: (212) 294-4700

Attorneys for Comcast Defendants.

*(Additional counsel information omitted)*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| ENTROPIC COMMUNICATIONS, LLC,<br><br>    Plaintiff,<br><br>  v.<br><br>COMCAST CORPORATION; COMCAST CABLE COMMUNICATIONS, LLC; AND COMCAST CABLE COMMUNICATIONS MANAGEMENT, LLC,<br><br>Defendants. | **No. 2:23-cv-1049-JWH-KES (Lead Case)**<br>**No. 2:23-cv-1050-JWH-KES (Related Case)**<br><br>Assigned to Hon. John W. Holcomb<br><br>**Declaration of Dr. Sandeep Chatterjee Regarding Claim Construction** |

# **TABLE OF CONTENTS**

I.           INTRODUCTION ........................................................................................ 5

II.          PERSONAL BACKGROUND ..................................................................... 7

    A.    Professional Qualifications ................................................................. 7

    B.    Compensation ................................................................................... 11

    C.    Materials Reviewed ......................................................................... 11

III.        RELEVANT LEGAL STANDARDS OF CLAIM CONSTRUCTION ...... 11

    A.    Claim Construction in District Court (the *Phillips* Standard) ....................... 11

    B.    Indefiniteness .................................................................................. 13

    C.    The Person of Ordinary Skill in the Art .......................................... 13

IV.       EVALUATION OF THE DISPUTED TERMS AND PHRASES OF THE ASSERTED '682 PATENT ............................................................... 14

    A.    The '682 Patent .............................................................................. 14

    B.    Cable modem termination system (CMTS) ('682 Patent) ............................ 15

    C.    SNR-related metric ('682 Patent) .................................................... 31

# TABLE OF EXHIBITS

| Exhibit | Description |
|---|---|
| A | File History of U.S. Patent No. 10,135,682 (ENTROPIC_COMCAST_021445-627) |
| B | File History of U.S. Patent No. 9,866,438 (ENTROPIC_COMCAST_018261– 452) |
| C | U.S. Patent No. 11,381,866 |
| D | File History of U.S. Patent No. 9,419,858 (ENTROPIC_COMCAST_018600) |
| E | Claim Construction Memorandum Opinion and Order in *Entropic Communications, LLC v. Charter Communications, Inc.*, 2:22-CV-00125-JRG |
| F | Curriculum vitae of Dr. Sandeep Chatterjee |
| G | List of documents or other information reviewed |
| H | U.S. Patent No. 9,100,622 |
| I | U.S. Patent N. 9,866,438 |
| J | U.S. Patent No. 9577886 |
| K | U.S. Patent No. 9,419,858 (ENTROPIC_COMCAST_018600 – 849) |
| L | U.S. Patent Application 61/674742 |
| M | Ciciora, Modern Cable Television Technology, 2nd ed. (2004), (DEF_ENTROPIC_PRIOR ART 00000018 – 1110) |
| N | U.S. Patent No. 10,135,682 |
| O | DOCSIS 3.0 MAC and Upper Layer Protocols Interface Specification, CM-SP-MULPIv3.0-I15-110210 (Feb. 10, 2011), (DEF_ENTROPIC_PRIOR ART 00010196 – 945) |
| P | DOCSIS 3.0 Physical Layer Specification, CM-SP-PHYv3.0-I10-111117 (Feb. 10, 2011), (DEF_ENTROPIC_PRIOR ART 00010196 – 945) |
| Q | DOCSIS 2.0 Radio Frequency Interface Specification, CM-SP-RFIv2.0-I11-060602 (June 2, 2006), (DEF_ENTROPIC_PRIOR ART 00067588 – 68123) |
| R | Riddel, PacketCable Implementation (2007), (COMCAST_ENTROPIC00039048-173) |

| Exhibit | Description |
|---------|-------------|
| S | Excerpts from Newton's Telecom Dictionary, 26th ed. (2011) (COMCAST_ENTROPIC00043291 – 310) |
| T | Evans, Digital Telephony Over Cable (2001) (COMCAST_ENTROPIC00039256 – 860) |
| U | Cisco UBR 10K Data Sheet (COMCAST_ENTROPIC00043399 – 404) |
| V | Cisco uBR-MC3GX60V Cable Interface Line Card Hardware Installation Guide, (COMCAST_ENTROPIC00043279 – 86) |
| W | ARRIS Unveils E6000 Converged Edge Router (COMCAST_ENTROPIC00042965 – 66) |
| X | ARRIS C4 24U CAM Data Sheet (COMCAST_ENTROPIC00042990 – 91) |
| Y | DOCSIS Downstream External PHY Interface Specification, CM-SP-DEPI-I08-100611 (June 11, 2010) (COMCAST_ENTROPIC00043127 – 278) |
| Z | ARRIS C4 CMTS Release 8.1 Data Sheet (COMCAST_ENTROPIC00042992 – 93) |
| AA | Patent App 13/948,401 |
| BB | U.S. Patent Publication No. 2014/0022926A1 |
| CC | Keiser & Strange, Digital Telephony and Network Integration (1985) (COMCAST_ENTROPIC00043287 – 90) |
| DD | Saadawi, Fundamentals of Telecommunication Networks (1994) (COMCAST_ENTROPIC00043382 – 85) |
| EE | Subscriber Drop Wiring For Interactive Services – Part 2 (COMCAST_ENTROPIC00042967 – 69) |
| FF | CM-GL-PNMP-V02-110623 (Proactive Network Maintenance Using Pre-equalization) (COMCAST_ENTROPIC00042994 – 3126) |

Declaration of Dr. Sandeep Chatterjee Regarding Claim Construction
CASE NO.: 2:23-CV-01049-JWH-KES

# I.     INTRODUCTION

1.     My name is Dr. Sandeep Chatterjee. I have been retained as an expert by Defendants Comcast Corporation, Comcast Cable Communication, LLC, and Comcast Cable Communication Management, LLC (collectively, "Comcast") in connection with *Entropic Communications LLC v. Comcast Corp.*, Case No. 2:23-cv-01050-JWH (C.D. Cal.).

2.     I understand that Entropic Communications, LLC ("Entropic") has asserted eight patents[1] in this action: U.S. Patent Nos. 8,223,775 ("the '775 patent"); 8,284,690 ("the '690 patent"); 9,210,362 ("the '362 patent"); 11,381,866 ("the '866 patent"); 11,399,206 ("the '206 patent"); 8,792,008 ("the '008 patent"); 9,825,826 ("the '826 patent"); and 10,135,682 ("the '682 patent"). In this declaration, I will refer to these eight patents collectively as the "asserted patents."

3.     In this declaration I offer opinions about claim terms the parties seek to construe in the '682 patent. I understand that Entropic has asserted claims 1-5 and 9 of the '682 patent.

4.     I understand that Entropic does not contend that the '682 patent is entitled to an invention date earlier than the filing dates of the earliest applications on the face of the '682 patent. The '682 patent ultimately claims priority to a provisional application filed on July 23, 2012. For purposes of the opinions in this declaration, I have assumed the filing date of the provisional application is the priority date.

5.     I have reviewed the '682 patent, its prosecution history (Ex. A), and prosecution histories of related patents, including U.S. Patent Nos. 9,866,438 (Ex. B), 9,577,886 (Ex. C), and 9,419,858 (Ex. D).

6.     I have been informed that the '682 patent was previously asserted in

---

[1] I understand that Entropic expects to assert U.S. Patent Nos. 9,866,438 ("the '438 patent") and 11,785,275 ("the '275 patent") in this case, but that those patents are not yet the subject of the claim construction process in this case.

Declaration of Dr. Sandeep Chatterjee Regarding Claim Construction
CASE NO.: 2:23-CV-01049-JWH-KES

*Entropic Communications, LLC v. Charter Communications, Inc.*, 2:23-cv-00052 (E.D. Tex). I also understand that some claim terms of the '682 patent were construed in the *Charter* case. *See* Ex. E (EDTX construction order).

7.     In this declaration, I have set forth my opinions about various technical issues relating to whether and how persons of ordinary skill in the relevant technical field would have understood these claims in view of the specifications and file history of the '682 Patent. I make this declaration based on my own personal knowledge and experience. If asked to testify, I would testify competently to these matters.

8.     This declaration, including the exhibits hereto, includes my opinions to date. I reserve the right to supplement this declaration if I receive additional relevant information or to respond to any expert opinion offered by Entropic. I may rely on demonstrative exhibits, including pictures, figures, and drawings that appear in this declaration and the referenced exhibits and materials in any testimony I provide before the Court.

9.     If I testify before the Court, I may also provide background on relevant communications technology, including data transmission over coaxial wires and cable networks, the hybrid fiber-coaxial cable network, the Data Over Cable Service Interface Specification ("DOCSIS") standard and related cable technology standards (e.g., the PacketCable standard), the simple network management protocol (SNMP), and any other relevant standard or protocol. I would also expect to provide an overview of the '682 Patent, any relevant related patents, and relevant file histories. I may also discuss the knowledge of a person of ordinary skill in the art as of the earliest claimed priority date, or the state of the art as of the earliest claimed priority date, to help explain my opinions. I may also explain developments in technology since the earliest claimed priority date of the alleged inventions in the asserted patents to demonstrate its evolution over time, and to assist the Court in extracting hindsight from its view of the claim

terms at the time of purported invention.

## II.   PERSONAL BACKGROUND

### A.   Professional Qualifications

10.   My qualifications and professional experience are described in my curriculum vitae, a copy of which is Exhibit F to this declaration. The below summarizes my relevant qualifications and professional experience.

11.   I am the Chief Executive Officer of Experantis LLC, a technology consulting company. Previously, I was the Executive Vice President and Chief Technology Officer of SourceTrace Systems, Inc., a technology and services company enabling the delivery of secure remote electronic services over landline and wireless telecommunications networks.

12.   I received my Bachelor's degree in Electrical Engineering and Computer Science from the University of California, Berkeley in 1995. I received my master's degree in Computer Science from the Massachusetts Institute of Technology (MIT) in 1997, and my doctorate in Computer Science from MIT in 2001. I received a certificate of completion for an executive education program on global leadership from Harvard University in 2011.

13.   My doctoral dissertation at MIT, entitled "Composable System Resources for Networked Systems," involving networked client architectures and systems, was selected as one of the top inventions in the history of MIT's Laboratory for Computer Science. This invention is showcased in a time capsule at the Museum of Science in Boston, Massachusetts. Other recipients of this honor include Bill Gates, the founder of Microsoft, and Tim Berners-Lee, the inventor of the World Wide Web.

14.   My Master's dissertation at MIT, entitled "Asynchronous Event Handling," was directed to efficient event handling and communications in a parallel computing

environment where the computing nodes are interconnected by a bidirectional 3-D mesh network.

15.     In 2011, I was named a Young Global Leader. This honor, bestowed each year by the World Economic Forum, recognizes and acknowledges the top leaders—all below the age of 40—from around the world for their professional accomplishments, commitment to society, and potential to contribute to shaping the future of the world. In 2016, I was appointed to the World Economic Forum's expert network as an expert in technology and innovation.

16.     From 1997, I was the Entrepreneur-in-Residence at FidelityCAPITAL, the venture capital arm of Fidelity Investments. In 1999, I founded and served as President and Chief Technology Officer (CTO) of Satora Networks, which developed tools and technologies for building appliances and services for the Internet using wireless and other technologies to extend it beyond the desktop.

17.     In 2001, I joined Bluestone Software's Mobile Middleware Labs as a Senior Engineer developing applications and systems infrastructure for enterprise Java/J2EE, Web services, and enterprise mobile solutions. After the completion of Hewlett-Packard's ("HP") acquisition of Bluestone, I became a Senior Member of the Technical Staff at HP's Middleware Division. I was responsible for architecting and developing the company's next-generation Web services platform for enterprise as well as mobile environments, known as the Web Services Mediator.

18.     I was part of the Expert Group that developed the JSR-00172 J2ME (Java 2 Platform, Micro Edition) Web Services Specification,[2] the worldwide industry standard for mobile Web services. I am the co-author, with James Webber, of the book "Developing Enterprise Web Services: An Architect's Guide" (published by Prentice-

---

[2] See JSR 172: J2ME™ Web Services Specification, *available at* https://jcp.org/en/jsr/detail?id=172

Hall in 2004).[3] This book has been adopted by over 100 universities and colleges around the world, and has been translated or reprinted in a number of countries around the world.

19.     I have extensive experience in architecting, developing, optimizing, deploying and managing computing and networking systems, including mobile, messaging/communications, and multimedia computing systems, including hardware and software for these systems. For example, through a contract between Hewlett-Packard and the United States Agency for International Development (USAID), I architected and led the development of one of the first mobile banking solutions. This system enabled customers to use their mobile phones and other wireless handsets to connect with the core banking systems of banks and other financial institutions, and perform transactions without having to travel to bank branches. This system supported many banking transactions, including loan applications, loan disbursement and loan repayments.

20.     Later, after SourceTrace Systems' acquisition of this technology, I led the expansion of this solution into multiple countries and into multiple industries. Banks and other financial services companies utilized this technology to make their tellers more efficient, to provide self-service kiosks within branches, and to provide remote access to banking services. Additionally, through our licensing agreement with Telefonica, one of the largest cellular and telecommunications companies in the world, this solution was deployed in various other industries, including logistics and asset management and customer relationship management. Bloomberg Television selected the company I had co-founded to commercialize this technology on Bloomberg TV's "Bloomberg Innovators" program.

21.     My doctoral research and dissertation involved networked computing hardware and software components that could be used in intelligent environments, e.g.,

---

[3] *See* S. Chatterjee and J. Webber, *Developing Enterprise Web Services: An Architect's Guide* (New Jersey: Prentice Hall PTR, 2004).

Declaration of Dr. Sandeep Chatterjee Regarding Claim Construction
CASE NO.: 2:23-CV-01049-JWH-KES

smart homes. These components could be used with consumer electronic devices, e.g., televisions, set-top boxes, refrigerators, digital picture frames, and children's toys, to enable communications and coordination between different devices. At any one consumer electronic device, a number of these hardware components, including computing resources and peripheral resources, could be connected together and connected to the consumer electronic device itself using a bus architecture. One of the applications that I developed as part of my dissertation work was an intelligent television set. These hardware and software components were connected to the television set and would receive and process key presses from a remote control, e.g., power on and channel up. The system would learn the user's television watching patterns to automate and facilitate the user's interactions with the television. This could include turning the television on at a particular time on a particular day and setting the television to a specific channel. These applications could also stream video and audio content to and between various devices. The technology underlying my doctoral dissertation work was spun out of MIT's Laboratory for Computer Science into a start-up company that developed and commercialized a number of applications of the technology, including intelligent toys and digital picture frames.

22.    I have been developing hardware and software, including for communication and networking systems, for nearly thirty years.  I have been familiar with cable data technologies, including the DOCSIS protocol and cable network infrastructure (*e.g.*, hybrid-fiber coax networks, CMTSs, and cable modems) since the late 1990's.

23.    I have been a retained expert witness for various disputes that involved significant technology issues, and I have been qualified as a technology expert by U.S. District and State Courts, including in California, Delaware, Florida and Texas and at the US International Trade Commission in technology areas that are relevant to this case. I

have previously testified through declaration or expert report, at deposition and at trial in numerous intellectual property and commercial litigation matters, including for patent litigation, copyright and trade secret misappropriation litigation, and contract dispute cases.

**B.     Compensation**

24.     Experantis LLC is being compensated for my time on this matter at my standard hourly rate of $950 per hour, and I am reimbursed for any expenses that I incur related to my work in this matter. Neither Experantis nor I have any financial interest in the outcome of this matter, and I will be paid for my time regardless of the outcome of this matter. My compensation does not depend on the outcome of this case and in no way affects the substance of my statements in this declaration.

**C.     Materials Reviewed**

25.     Exhibit G is a list of documents or other information that I have relied on in forming my opinions.

**III.   RELEVANT LEGAL STANDARDS OF CLAIM CONSTRUCTION**

26.     The legal principles set forth in this section were provided to me by counsel for Comcast.

**A.     Claim Construction in District Court (the *Phillips* Standard)**

27.     I have been informed that during the claim construction process, a court must determine the proper meaning and scope of the claims. Claim construction is a matter of law that is decided by the judge who presides over the litigation.

28.     I understand that patent claims are to be construed in view of the intrinsic record of the patent, which includes: the language of the claims; the specification, including the drawings, of the patent; and the prosecution history of the patent. This evidence is known as "intrinsic evidence."

29.     I understand that in the intrinsic evidence, the inventors of a patent may expressly define certain terms. It has been explained to me that this is known as the inventors acting as "lexicographers." I understand that where the inventors acted as their own lexicographers, those definitions control the meaning of the defined terms in the claims.

30.     I understand that the prosecution history provides evidence of how the patentee and the examiner viewed the patent, and that the public has a right to rely on the patent applicant's remarks made during prosecution in determining the scope of the claimed invention. For example, arguments and amendments made during prosecution may provide an explanation of the meaning of a claim term, or narrow a claim term that is used more broadly in the specification. In some instances, when an applicant explicitly states that some breadth of a term is excluded from their invention, they may disclaim claim scope through statements, or by making specific arguments distinguishing the claimed invention over cited prior art, during prosecution.

31.     I understand that, absent lexicography or disavowal, claims are given their ordinary and customary meaning in light of the specification.

32.     I understand that the ordinary and customary meaning is the meaning that the term would have to a person of ordinary skill in the art at the time of the invention.

33.     I have been informed that the Court may also consider additional evidence outside the patent and prosecution history. This type of evidence is known as "extrinsic" evidence. Extrinsic evidence can include expert opinion (including opinions about what one of ordinary skill in the art would have known or understood), dictionaries, treatises, and testimony. As some examples, extrinsic evidence can be useful to provide background on the technology at issue, explain how an invention works, ensure that the Court's understanding of the technical aspects of the patent aligns with that of a person of ordinary skill in the art, or establish that a particular term in the patent or the prior art

has a particular meaning in the pertinent field. I understand that extrinsic evidence must be considered in the context of the intrinsic evidence and cannot be used to change the meaning of a claim term to contradict the intrinsic evidence.

**B.    Indefiniteness**

34.    I understand that there is a requirement in patent law that a claim must particularly point out and distinctly claim the subject matter which the patentee regards as the invention. I also understand that a claim fails to satisfy this requirement and is thus invalid as indefinite if the claim, read in light of the intrinsic evidence, fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention. I understand that the claim must be clear enough for a person of ordinary skill in the art to reasonably determine the metes and bounds of the claim (i.e., understand what falls within or outside the scope of the claim).

**C.    The Person of Ordinary Skill in the Art**

35.    I understand that the level of ordinary skill may be reflected by the state of the art at the time of the invention, including the prior art of record.  I also understand that a person of ordinary skill in the art would have the capability of understanding the scientific and engineering principles applicable to the pertinent art and the claimed subject matter. I understand that one of ordinary skill in the art has ordinary creativity and is not an automaton.

36.    I understand there are multiple factors relevant to determining the level of ordinary skill in the pertinent art, including (1) the levels of education and experience of persons working in the field at the time of the invention; (2) the sophistication of the technology; (3) the types of problems encountered in the field; and (4) the prior art solutions to those problems.

37.    As discussed above and detailed in my *curriculum vitae*, I am very familiar with the communications art that is pertinent to the asserted patents. I am also aware of

Declaration of Dr. Sandeep Chatterjee Regarding Claim Construction
CASE NO.: 2:23-CV-01049-JWH-KES

the state of the art as of the earliest claimed priority date. My experience in the field, with colleagues from academia, and with engineers practicing in the industry during the relevant timeframe allowed me to become personally familiar with the knowledge and capabilities of a person of ordinary skill in the art.

38.     A person of ordinary skill in the art in the field of the '682 patent, as of the earliest claimed priority date, would have had at least a degree in computer or electrical engineering, computer science, information systems, or a similar discipline, along with at least three to four years of experience with the design and/or implementation of network-based content delivery systems.  I was a person of skill in the art as of the earliest claimed priority date of the '682 patent.

39.     Unless otherwise stated, when I provide my understanding and analysis below, it adheres to the level of a person of ordinary skill in the art as of the earliest claimed priority date of the Asserted Patents.

## IV.    EVALUATION OF THE DISPUTED TERMS AND PHRASES OF THE ASSERTED '682 PATENT

### A.    The '682 Patent

40.     U.S. Patent No. 10,135,682 ("the '682 patent") issued on November 20, 2018, from an application filed on January 9, 2018. The '682 patent claims priority to unasserted U.S. Patent No. 9,100,622 ("the '622 Patent") Ex. H, which claims priority to unasserted U.S. Patent No. 9,866,438 ("the '438 patent") Ex. I, which claims priority to unasserted U.S. Patent No. 9,577,886 ("the '886 patent") Ex. J, which claims priority to unasserted U.S. Patent No. 9,419,858 ("the '858 patent") Ex. K, which issued from a non-provisional application filed on July 23, 2013, and which claims priority to a provisional application (App. No. 61/674,742) filed on July 23, 2012. Ex. L.

41.     The asserted claims of the '682 patent are directed to methods in which a cable modem termination system (CMTS) utilizes an SNR profile related to connected

Declaration of Dr. Sandeep Chatterjee Regarding Claim Construction
CASE NO.: 2:23-CV-01049-JWH-KES

cable modems, groups the connected cable modems into service groups based on SNR profiles, and selects communication parameters for the service groups to use when communicating with the service groups based on composite SNR profiles of the service groups. Ex. N ('682 patent), claims 1-5, 9; *see also id.* Abstract, FIG. 3A, 5:28-57.

42.     During prosecution of the '682 patent, the examiner first rejected the claims for non-statutory double patenting over patents in its priority chain, but stated the claims would otherwise be allowable if the double patenting rejections were overcome. Ex. A ('682 file history) at ENTROPIC_COMCAST_021505-533. The applicants responded by filing terminal disclaimers to the priority patents. *Id.* at ENTROPIC_COMCAST_021505-533. The examiner then allowed the claims. *Id.* at ENTROPIC_COMCAST_021578-580. The double patenting rejection over U.S. Patent No. 9,577,886 is relevant to the terms being construed here because the examiner provided claim charts comparing the '682 patent claim language with the language of claims of the earlier patents.

43.     I understand that Entropic asserts claims 1-5 and 9 of the '682 patent.

44.     In this declaration, I offer my opinions about the following claim terms:

| Term(s), Phrase(s), and/or Clause(s) | Patent(s) and Claim(s) |
|---|---|
| "cable modem termination system (CMTS)" | '682 patent, claims 1, 3-5, and 9 |
| "SNR-related metric" | '682 patent, claims 1 and 9 |

**B.     Cable modem termination system (CMTS) ('682 Patent)**

45.     I understand that the parties have proposed the constructions below for "cable modem termination system (CMTS)":

| Comcast's Proposed Construction | Entropic's Proposed Construction |
|---|---|
| equipment at which the cable modem's connection to the hybrid fiber coaxial network terminates | Plain and ordinary meaning |

46.    It is my opinion that Comcast's proposed construction of "cable modem termination system" to mean "equipment at which the cable modem's connection to the hybrid-fiber coaxial network terminates" reflects the ordinary and customary meaning that a person of ordinary skill in the art would attribute to the meaning of "cable modem termination system" at the time of the alleged invention (i.e., the claimed priority date of July 23, 2012).

47.    A person of ordinary skill in the art reviewing the intrinsic evidence, including the '682 patent's specification and relevant prosecution histories, would understand that a CMTS is equipment at which the cable modem's connection to the hybrid fiber coaxial network terminates.

48.    For example, Figure 1 of the '682 patent depicts an exemplary cable DOCSIS network with a CMTS 102 and several cable modems ($112_1$-$112_5$). Figure 1 shows that the cable modems connect to the CMTS through several components, including fiber node 104, fiber optic cable 103, coaxial cables 105, amplifiers 106, couplers 108, interfaces 109, and splitters 110. The patent explains that, collectively, these components "between the CMTS and the CMs may be referred to as a hybrid fiber coaxial (HFC) network." *Id.*, 3:47-50."   The HFC network runs from the CMs to the CMTS and connects the two. Thus, the CMTS (102) is equipment at which the cable modems' ($112_1$-$112_5$) connection to the hybrid-fiber coaxial network (103, 104, 105, 106, 107, 108, 109, 110) terminates.



**FIG. 1**

Ex. N ('682 patent), Fig. 1 (CMTS highlighted in blue, HFC highlighted in yellow, cable modems highlighted in green).

49.     Figure 2A also shows that the HFC network sits between the CMTS and the cable modem. *See* Ex. N ('682 patent), 3:53-4:2.[4] The cable modem's connection to the HFC network ends at the CMTS. Thus, the CMTS (102) is equipment at which the cable modem's (112x's) connection to the hybrid-fiber coaxial network (HFC network cloud shape) terminates.

---

[4] The description of Fig.2A also explains that the box drawn as 202 is intended to be a packet sent from the CMTS to the cable modem, which is sent over the HFC network. Ex. N ('682 patent) at 3:53-63 ("FIG. 2A depicts an example method of determining locations of CMs within the HFC network. As shown in FIG. 2A, to determine one or more measured performance metric(s) (e.g., an SNR-related metric such as SNR at a particular frequency or SNR over a range of frequencies (an SNR profile), noise levels, strength of desired signals, and/or the like) for any particular CM 112x, the CMTS 102 may transmit, at time 1, a message 202 that is destined (unicast, multicast, or broadcast) for the CM 112x and that functions as a probe to enable determination of the metric(s) for the CM 112x.").

FIG. 2A

Ex. N ('682 patent), Fig. 2A (CMTS highlighted in blue, HFC highlighted in yellow, cable modems highlighted in green).

50.    The disclosures of the '682 Patent are consistent with contemporaneous technical documents that define and reference CMTS.

51.    Comcast's construction is also consistent with contemporaneous technical documents that define and reference CMTS.

52.    The cable-industry standard DOCSIS supports construction of CMTS as equipment at which the cable modem's connection to the hybrid-fiber coaxial network terminates. DOCSIS was developed in the late 1990s, when a group of cable television operators and CableLabs jointly developed a set of purchase specifications as a procurement standard for cable modems. Ex. M (Ciciora book), 194. The formal name of these specifications was Data Over Cable Service Interface Specifications. The specification of the '682 patent makes clear that the cable network described and depicted in the patent is a DOCSIS network. Ex. N ('682 patent), 2:56-57, 3:42-45, 5:28-30, 6:7-8.

53.     DOCSIS standard specifications define "cable modem termination system (CMTS)." One example of DOCSIS's definition can be found in the "DOCSIS 3.0 MAC and Upper Layer Protocols Interface Specification," released February 10, 2011. That document defined "Cable Modem Termination System" as "Cable modem termination system, located at the cable television system head-end or distribution hub, which provides complementary functionality to the cable modems to enable data connectivity to a wide-area network." Ex. O (DOCSIS MAC spec), 10. A head-end or distribution hub is the facility that receives signals (such as cable television signals) and distributes those signals through the hybrid fiber coaxial network to cable modems. A person of ordinary skill in the art at the time of the alleged invention would have understood that, because the CMTS is "located at" the head-end or distribution hub, the CMTS of the DOCSIS definition is equipment.  Further, Figure 1.1 of Ex. O (DOCSIS MAC spec) illustrates that cable modems (labeled "CM") connect to the cable modem termination system (labeled "CMTS") via a hybrid fiber coaxial network (labeled "HFC") such that the cable modem's connection to the HFC terminates at the CMTS.

### 1.2.2   DOCSIS Network and System Architecture

The elements that participate in the provisioning of DOCSIS services are shown in Figure



*Figure 1–1 - The DOCSIS Network*

Ex. O. (DOCSIS MAC spec), 1. The DOCSIS 3.0 MAC and Upper Layer Protocols Interface Specification thus shows that the cable-modem termination system is equipment with a physical location (i.e. the head-end) and is where the cable modem's connection to the hybrid fiber coaxial network terminates.

54.    The "DOCSIS 3.0 Physical Layer Specification" from November 17, 2011, contains the same definition as the DOCSIS 3.0 MAC and Upper Layer Protocols Interface Specification. Ex. P (DOCSIS PHY spec), 9. So does the "DOCSIS 2.0 Radio Frequency Interface Specification" from June 2, 2006. Ex. Q (DOCSIS RFI spec), 12.

55.    Contemporaneous books show that a person of skill in the art would have understood DOCSIS to define "cable modem termination system" (CMTS). For

Declaration of Dr. Sandeep Chatterjee Regarding Claim Construction
CASE NO.: 2:23-CV-01049-JWH-KES

example, a book published by Cisco, titled PacketCable Implementation, in 2007 stated that "the CMTS is defined in the DOCSIS specification." Ex. R (Cisco book), 34.

56.     DOCSIS's reference architecture also supports construction of CMTS as equipment at which the cable modem's connection to the hybrid-fiber coaxial network terminates. The textbook Modern Cable Television Technology from 2004 depicted and described the DOCSIS reference architecture. Ex. M (Ciciora). Specifically, Ciciora Figures 5.6 and 5.7 depict the reference architecture. I have highlighted relevant components of Ciciora Figures 5.6 and 5.7, including the "cable modem" (highlighted in green), the "Cable modem termination system (CMTS)" (highlighted in blue), and the connecting hardware between the two (highlighted in yellow), called the hybrid fiber coaxial network or "HFC" network:



**Figure 5.6** DOCSIS reference architecture, headend to home.

Ex. M (Ciciora), 194.

Declaration of Dr. Sandeep Chatterjee Regarding Claim Construction
CASE NO.: 2:23-CV-01049-JWH-KES



**Figure 5.7** DOCSIS reference architecture, headend.

Ex. M (Ciciora), 196. Ciciora explains:

> Figure 5.6 illustrates the headend-to-home portion of the DOCSIS reference architecture. … In the downstream direction, the data signals, bubble A, are coupled with other downstream signals and supplied to the downstream HFC network …. Figure 5.7 illustrates the headend portion of the reference architecture. Bubbles A and B correspond to the same bubbles in the previous figure. The cable modem termination system (CMTS) includes the demodulator and modulator, which interface to the cable system. It also includes the interface to the network. Several options are defined for interfacing with the Internet backbone, either locally or (probably more commonly) by reaching a

Declaration of Dr. Sandeep Chatterjee Regarding Claim Construction
CASE NO.: 2:23-CV-01049-JWH-KES

remote Internet backbone point of presence via a wide area network.

Ex. M (Ciciora), 194-195.

57.      The Ciciora depiction of the DOCSIS reference architecture, and its description of that architecture, confirm that the CMTS is equipment, including a modulator and demodulator, that is the termination point in the headend for the hybrid fiber coaxial network that connects to the cable modems in the customer's premise.

58.      The 26th edition of Newton's Telecom Dictionary from 2011 also supports construction of CMTS as equipment at which the cable modem's connection to the hybrid-fiber coaxial network terminates. Newton's Telecom Dictionary defines CMTS as:

> **Cable modem termination system** CMTS. A piece of hardware located in a cable operator's local network (generally in a "headend") that acts as the gateway to the Internet for cable modems in a particular geographic area. A simple way to think of the CMTS is as a router with interfaces on one side leading to the Internet and interfaces on the other connecting to optical nodes and then customers. To deliver data services over a cable network, one six-MHz television channel (in the 50-750 MHz range) is typically allocated for downstream traffic to homes and another channel (in the 5-42 MHz band) is used to carry upstream signals. A head end CMTS communicates through these channels with cable modems located in subscriber homes to create a virtual LAN connection. See also cable modem, CableLabs Certified, and DOCSIS.

Ex. S (Newton's), 232. Newton's definition confirms that the CMTS is equipment located in the cable operator's local network, generally in the headend. Newton's definition also confirms that the CMTS connects on one side to optical nodes (the HFC network) that connect to customers. A person of skill in the art at the time of the alleged invention would have understood that the connection to "customers" consists of a

connection to a cable modem at a customer premises. Thus, Newton's definition supports that the CMTS is equipment at which the cable modem's connection to the HFC network terminates.

59.     The textbook Digital Telephony Over Cable from 2001 also supports construction of CMTS as equipment at which the cable modem's connection to the hybrid-fiber coaxial network terminates. Ex. T (Evans). Evans described the delivery of telephony services through a standard called PacketCable that was built on top of DOCSIS. Ex. T (Evans), 17. Figure 1-6 of Evans depicts a home connected to an HFC network that terminates at a CMTS:



**Figure 1-6**   Basic PacketCable Telephony Network Architecture

Ex. T (Evans), 17 (CMTS highlighted in blue, HFC highlighted in yellow).

60.     The MTA in Figure 1-6 combines a DOCSIS cable modem and analog telephone adapter (ATA) in one unit. Evans explains:

> In the MSO's headend, the access network is terminated in a Cable Modem Termination System (CMTS). … Unlike analog modem systems, where the two ends of the link are peers, CMs act as clients to CMTSes, which instruct them exactly how to operate (see Chapter 3). The fact that the cable portion of the HFC network is a relatively low bandwidth resource that must be shared among many users is at the root of many of the difficulties in deploying digital telephony over such networks.

Ex. T (Evans), 17. A person of ordinary skill in the art at the time of the alleged invention would have understood that the CMs referenced in Evans are located at the home depicted in Figure 1-6. A person of ordinary skill in the art would further understand that the referenced "access network" that Evans describes as being "terminated" at the CMTS is an HFC network that connects to the individual cable modems/MTAs (i.e., the network highlighted in Yellow in Figure 1-6). The HFC network connects the CMs to the CMTS, where the connection to the HFC terminates.

61.     Although the Evans and Cicora books were published in 2001 and 2004 respectively, their definitions of CMTS reflect a long-standing understanding of the term that is consistent with the DOCSIS specification (*supra* ¶ 53) and CMTS equipment (*infra* ¶¶ 62-64) sold in 2012, the claimed priority date of the '682 patent.

62.     Ciciora's drawings and text, the definition of CMTS in the DOCSIS specification, Newton's dictionary, and the discussion in Evans's textbook also track the description of CMTS in the Cisco PacketCable book mentioned above. Besides pointing to DOCSIS for the definition of CMTS, the Cisco PacketCable book also stated that "[t]he CMTS is typically located in the MSO's headend or distribution hub," and that "[t]he CMTS provides the DOCSIS connectivity to the cable modems and IP

Declaration of Dr. Sandeep Chatterjee Regarding Claim Construction
CASE NO.: 2:23-CV-01049-JWH-KES

1  connectivity to the service provider's backbone via some sort of WAN interface." Ex. R

2  (Cisco book), 34.

3        63.    Ciciora's drawings and text, the definition of CMTS in the DOCSIS

4  specification, Newton's dictionary, the discussion in Evans's textbook, and the

5  discussion in the Cisco PacketCable book also track my own personal recollections

6  from this time frame.

7        64.    The CMTSs sold in or before July 2012 further support Comcast's

8  construction.  Cisco Systems, Inc. and ARRIS Group Ltd. were major vendors of

9  CMTSs in the 2012 timeframe.  The primary CMTS that Cisco provided in 2012 was

10 the uBR10012 Universal Broadband Router ("uBR 10k").  *See* Exs. U, V.  ARRIS

11 provided the C4 CMTS.[5]  *See* Ex. X and Y.  An image of a uBR 10k and ARRIS C4 are

12 provided below.




**Cisco UBR 10k**                    **ARRIS C4**

---

[5] ARRIS also introduced the E6000 in October 2012.  *See* Ex. W ("ARRIS Unveils E6000 Converged Edge Router," Oct. 16, 2012).

Ex. U (UBR 10K Data Sheet) at 2; Ex. X (C4 CMTS Release 8.1) at 1.

65.    All of these CMTSs terminated a cable modem's connection to the HFC. For example, these Cisco and ARRIS CMTSs contained an upstream line card to which the HFC interconnected, and the upstream connection from the cable modem terminated.

   

**Cisco UBR 10k – MC20X20V**                    **ARRIS C4 - 24U CAM**

Ex. V (MC20x20V Data Sheet) at 2; Ex. X (C4 24U CAM Data Sheet) at 1.

66.    At the time of the alleged invention, downstream transmissions (from the CMTS to the cable modems) could be provided from the CMTS chassis alone (called an Integrated CMTS configuration), or in combination with a device called an Edge QAM device that sat external to the CMTS chassis (called a Modular CMTS configuration).[6] But upstream transmissions from the cable modem in this timeframe always terminated

---

[6] *See* Ex. U (UBR 10K Data Sheet) at 2 ("In addition to increasing the bandwidth available on the downstream, Cisco wideband  also reduces the cost.  It does this using inexpensive, field-proven edge quadrature amplitude modulation (QAM) modulators such as the Cisco RFGW-1 and RFGW-10 models in order to increase the downstream capacity of the Cisco uBR10012 and reduce RF downstream costs.  This enables cable operators to use the lower edge QAM port prices and to add new downstream without adding additional upstreams at the same time."; Ex. V (uBR-MC3GX60V Cable Interface Line Card Hardware Installation Guide) at 2 ("The GE interfaces connect to an external Edge Quadrature Amplitude Modulation (EQAM) device and provide M-CMTS compliant Downstream External PHY Interface (DEPI) data."); *see also* Ex. Y (DOCSIS External PHY spec, CM-SP-DEPI-I08-100611 at 1 ("This document defines an interface known as the Downstream External PHY Interface (DEPI) and associated protocol requirements for the transport of downstream user data between the 'M-CMTS Core' and the EQAM"); *id.* at Fig. 6; Ex. Q (CM-SP-RFIv2.0-I11-060602) at Fig. 5-2 (showing modular CMTS and upstream connections from cable modem terminating at CMTS).

in the CMTS.  The relevant DOCSIS standards for supporting Edge QAM, called DEPI, only supported downstream.  Ex. Y (DOCSIS External PHY spec, CM-SP-DEPI-I08-100611.

67.     I understand that Entropic proposes that "cable modem termination system" should be given its "plain and ordinary meaning."  I also understand that until the morning of April 19, Entropic proposed that this term should be construed as "plain and ordinary meaning, wherein the CMTS may be realized in hardware, software, or a combination of hardware and software, and may be realized in a centralized or distributed fashion." Any suggestion by Entropic that the "plain and ordinary meaning" of the claimed "cable modem termination system" implies that it can be implemented using software or in a distributed fashion is inconsistent with the disclosure of the '682 patent.

68.     Claim 7 of the '682 patent, which depends from claim 1, recites "assigning said cable modems among said plurality of service groups based on respective distances between said CMTS and said cable modems." '682 at 8:7-9 (Claim 1) and 8:62-65 (Claim 7).  Claim 1 also recites "assigning, by said CMTS, each cable modem among a plurality of service groups based on a respective corresponding SNR-related metric." Both claims show that the recited CMTS assigns cable modems to service groups, and claim 7 shows that the distance from the CMTS to the cable modem can be used to determine assignment.  A person of ordinary skill would understand that there could only be a "distance" between the CMTS and a cable modem if the CMTS is a piece of hardware with a specific spatial position, and not solely "software," which could be executed at an unspecific spatial position.  Similarly, the "CMTS" of the '682 patent cannot be "distributed" hardware because the '682 patent provides no guidance regarding which portion of that distributed system would be used to calculate the distance between the "CMTS" and the cable modem as required by claim 7.

69.     The '682 patent also describes that the CMTS "may comprise circuitry operable to manage connections" to the cable modems. '682 at 2:61-62. Such circuitry supports Comcast's construction that when the '682 patent refers to a CMTS, it is referring to hardware equipment, not software.  Similarly, a person of ordinary skill would understand consistent with the DOCSIS specification, textbooks, and real world equipment discussed above, that a CMTS would manage the cable modems to which it is connected by the HFC.

70.     The '682 patent never refers to the CMTS as being "distributed." The patent only describes CMTS as a singular piece of equipment, both in the figures (*e.g.*, Figures 1 and 2A) and in the description (*e.g.*, 2:61-62, 3:47-50).

71.     During prosecution of U.S. Patent No. 9,419,858 (the "'858 patent"), which is a parent to the '682 patent the applicant argued that the alleged invention did not relate to a generic or general-purpose computer in order to overcome a Section 101 rejection. The applicant stated that a CMTS is a particular type of computing device:

> Each of claims 1 and 12 recites significantly more than "manipulating information using mathematical relationships" at least because it recites that the alleged "manipulating information using mathematical relationships" is applied with a particular machine, namely a cable modem termination system (CMTS).

> Contrary to the Office's findings, a CMTS is certainly not a "generic computer." It is a specific set of hardware and software configured for the very specific purpose of managing and communicating with cable modems over a hybrid fiber coaxial (HFC) network. Thus, each of claims 1 and 12 does not attempt the preempt every possible use of generating a composite SNR related metric, but instead only claims the use of such a metric by the very particular machine of a CMTS for the specific purpose of assigning cable modems among service groups. For at least this reason, each of claims 1 and 12 claims significantly

-29-
Declaration of Dr. Sandeep Chatterjee Regarding Claim Construction
CASE NO.: 2:23-CV-01049-JWH-KES

more than "manipulating information using mathematical relationships," and the § 101 rejection should be withdrawn.

Ex. D ('858 File History) at ENTROPIC_COMCAST_018798.  The applicant's statements during prosecution confirm that, at the time of the alleged invention, a person of skill would understand that the CMTS is a specific set of hardware (*supra* ¶¶ 53-64) that a person of skill would understand to be the equipment at which the cable modem's connection to the HFC terminates.

72.    The '682 specification states the following:

> Accordingly, the present invention may be realized in hardware, software, or a combination of hardware and software. The present invention may be realized in a centralized fashion in at least one computing system, or in a distributed fashion where different elements are spread across several interconnected computing systems. Any kind of computing system or other apparatus adapted for carrying out the methods described herein is suited. A typical combination of hardware and software may be a general-purpose computing system with a program or other code that, when being loaded and executed, controls the computing system such that it carries out the methods described herein. Another typical implementation may comprise an application specific integrated circuit or chip.

Ex. N ('682 patent), 7:31-44.

73.    But this generalized discussion does not discuss any aspects of a CMTS, and does not even mention the terms "cable modem termination system" or "CMTS." To the contrary, the "accordingly," refers back to the previous paragraph, which references "other embodiments."

74.    A person of ordinary skill in the art at the time of the alleged invention would not understand the '682 specification's disclosures (at 7:33-44) as stating that a CMTS can be "any kind of computing system or apparatus" that is "realized in

Declaration of Dr. Sandeep Chatterjee Regarding Claim Construction
CASE NO.: 2:23-CV-01049-JWH-KES

hardware, software, or a combination of hardware and software," or a "general-purpose computing system." That would be inconsistent with the use of the term in the patent and the meaning of CMTS to a person of ordinary skill in the art at the time of the alleged invention, and the patent does not purport to redefine CMTS or to disclose a new type of CMTS consistent with that definition.

75.     Similarly, a person of ordinary skill in the art at the time of the alleged invention would not understand the '682 specification's disclosures (at 7:33-44) to be stating that a CMTS may be either centralized or distributed. That would be inconsistent with the use of the term in the patent and the meaning of CMTS to a person of ordinary skill in the art at the time of the alleged invention, and the patent does not purport to redefine CMTS or disclose a new type of CMTS consistent with that definition.

76.     Because both the intrinsic and extrinsic evidence supports construing "cable modem termination system" as "equipment at which the cable modem's connection to the hybrid-fiber coaxial network terminates," it is my opinion that Comcast's proposed construction is correct.

### C.     SNR-related metric ('682 Patent)

77.     I understand that the parties have proposed the constructions below for "SNR-related metric":

| Comcast's Proposed Construction | Entropic's Proposed Construction |
| --- | --- |
| Indefinite | Plain and Ordinary Meaning |

78.     It is my opinion that "SNR-related metric" is indefinite.

79.     When viewed in light of the specification and prosecution history, "SNR-related metric" fails to inform those skilled in the art about the scope of the claim with reasonable certainty. While signal-to-noise ratio, commonly referred to as "SNR," is a well-known term, "SNR-metric" and "SNR-related-metric" had no established or

reasonably certain meaning to a person of ordinary skill in the art at the time of the alleged invention. The claims, specification, and the file history of the '682 patent fail to inform, with reasonable certainty, a person of ordinary skill in the art about the scope of the term.

80.    The term "SNR-related metric" is not a term of art, and has no known meaning to a person of skill in the art.  I have not found a dictionary definition for "SNR-related metric."

81.    The '682 specification suggests that an "SNR-related metric" is an example of a "measured performance metric," but it does not delineate the scope of the term:

> As shown in FIG. 2A, to determine one or more measured performance metric(s) ***(e.g., an SNR-related metric such as SNR at a particular frequency or SNR over a range of frequencies (an SNR profile), noise levels, strength of desired signals, and/or the like)*** for any particular CM $112_X$, the CMTS 102 may transmit, at time 1, a message 202 that is destined (unicast, multicast, or broadcast) for the CM 112x and that functions as a probe to enable determination of the metric(s) for the CM $112_X$.

Ex. N ('682 patent), 3:54-63 (emphasis added).

82.    A person of ordinary skill in the art would understand that the patent's reference to "an SNR-related metric such as SNR at a particular frequency or SNR over a range of frequencies (an SNR profile), noise levels, strength of desired signals, and/or the like)" sets forth four examples of SNR-related metrics: strength of desired signals, noise levels, and the two closely related metrics of SNR at a particular frequency and SNR over a range of frequencies.  SNR at a particular frequency and SNR at a range of frequencies incorporate SNR itself. "Noise levels" and "strength of desired signals" are the two variables used to compute SNR.  However, the parenthetical goes on to say that an "SNR-related metric" can be something "such as" any of these four examples "and/or

Declaration of Dr. Sandeep Chatterjee Regarding Claim Construction
CASE NO.: 2:23-CV-01049-JWH-KES

*the like*," without any explanation of what is sufficiently "like" the four examples to constitute an "SNR-related metric."

83.     A person of ordinary skill in the art would not know with reasonable certainty what additional metrics are sufficiently "like" the four listed metrics (which either incorporate SNR or are the figures used to calculate SNR) to constitute "SNR-related metrics, " and the '682 patent offers no guidance as to how to determine what other metrics may be "SNR-related metric[s]."

84.     The failure of the intrinsic record to provide reasonable certainty is clear in view of U.S. Patent Application No. 13/948,401 (which is incorporated by reference in the '682 patent). That application states:

> A measured performance metric may be, for example, an SNR-related metric such as noise levels, strength of received desired signals, SNR at a particular frequency, SNR over a range of frequencies (an SNR profile), bit error rate, symbol error rate, and/or the like.

Ex. AA (401 Patent App.) at ¶ 24.

It thus identifies two additional "SNR-related metrics" besides those set forth in the '682 Patent: "bit error rate" and "symbol rate." U.S. Patent Pub. No. 2014/0022926 (issuing from Application No. 13/948,401) at ¶ 30. Ex. BB. And, like the passage at 3:54-63 of the '682 patent, it includes the phrase "*and/or the like*," which indicates still other metrics may be SNR-related. These additional examples thus suggest that SNR-related metrics are not necessarily limited to those that incorporate SNR and/or the components used to calculate SNR. But the application provides no further guidance for determining whether a particular additional metric is SNR-related.

85.     Claims of other related patents further add to the uncertainty as to what is, and is not, an "SNR-related metric."  For example, claim 1 of U.S. Patent No. 9,577,886 ("the '886 patent"), a parent to the '682 patent, contains claims with similar limitations.

1  But claim 1 of the '886 patent recites "a corresponding plurality of signal-to-noise ratio

2  (SNR) related metrics comprising SNR versus frequency profiles." Ex. A ('682 file

3  history) at ENTROPIC_COMCAST_021509. The difference in claim language makes

4  clear that there is a further distinction between "SNR versus frequency profiles." Yet,

5  that is the only way an "SNR-related metric" is described in the specification. The

6  specification discusses "an SNR-related metric such as SNR at a particular frequency or

7  SNR over a range of frequencies," and both of these examples are "SNR versus

8  frequency profiles." *See* Ex. T ('682 patent), at 3:54-64. Thus, nothing in the

9  specification, or the knowledge of a person of ordinary skill in the art, would inform a

10  person of skill in the art what more an "SNR-related metric" comprises beyond "SNR

11  versus frequency profiles."

12        86.    As of the earliest claimed priority date (2012), a person of skill in the art

13  would have no understanding of how to determine whether a given metric is an "SNR-

14  related metric," within the meaning of the patent.  A wide range of additional metrics

15  may, in theory, impact SNR or be impacted by SNR. In a given system, however, not all

16  of those metrics impact or are impacted by SNR. A person of ordinary skill in the art at

17  the time of the alleged invention would not have known whether "SNR-related metric"

18  refers to any metric having a theoretical relationship to SNR, or a metric observed to

19  have a relationship to SNR in some other system, such as an allegedly infringing

20  system. These alternative measures of relatedness would have materially different

21  outcomes for the claim's boundaries such that a method that might infringe the claim

22  under one meaning might not infringe under another other. In other words, a person of

23  ordinary skill in the art cannot reasonably determine when infringement occurs and

24  when it does not.

25        87.    Latency is an example of a metric that is sometimes impacted by SNR and

26  at other times not impacted by SNR. Latency is a metric comprising the "waiting time

27

Declaration of Dr. Sandeep Chatterjee Regarding Claim Construction
CASE NO.: 2:23-CV-01049-JWH-KES

or time delay" for network communications.  Ex. L (Newton's), 674-675 ("latency").  A person of skill would understand that a decrease in SNR *could in some systems and circumstances* lead to an increase in latency, because lower SNR could result in additional need to retransmit packets, increasing transmission delay and thus latency.  A person of skill would further understand that a decrease in SNR *could in some systems and circumstances* lead to an increase in latency because of the need to assess additional errors and request re-transmission, increasing processing delay and thus latency.  But a person of ordinary skill would also understand that changes in SNR could also have no affect or relationship to latency at all in a given system.  That is because numerous other factors, including the transmission protocol, encoding, and the speed of the receiving equipment would determine what impact, *if any*, a change in SNR would have on latency.

88.    Importantly, latency is one degree removed from bit error rate, which is discussed as a SNR-related metric in one of the applications incorporated into the '682 patent.  A decrease in SNR could impact bit error rate, and depending on the degree of impact on bit error rate, and multiple other factors, an increased bit error rate could also lead to an increase in latency due to the need for additional processing or packet retransmission.  But nothing in the '682 specification would help a person of skill understand whether the mere potential relationship between SNR and latency would make latency an "SNR-related metric." *See also* Ex. CC (Keiser & Strange) ("There are several characteristics of transmission systems which degrade the quality of signals.  Among these are noise, loss, amplitude/frequency distortion, crosstalk, echo, and delay distortion.").

89.    A similar issue is presented by the metric "throughput," which is "[t]he actual amount of useful and non-redundant information which is transmitted or processed" i.e., "the end result of a data call." Ex. L (Newton's), 1157 ("throughput");

*see also* Ex. DD (Saadavi) ("[T]he average throughput is defined as the ratio of the number of packets that are successfully transmitted in a very long interval to the maximum number of packets that could have been transmitted with continuous transmission on the channel."). Like latency, throughput may sometimes be impacted by SNR and may sometimes not be. That is, throughput could or could not be related to SNR. As the signal-to-noise ratio of a system improves, it could provide more throughput, but SNR could also have no affect on throughput.  That is because numerous other factors, including network transmission technique (e.g., TDM or FDM), transmission protocol, transmission bottlenecks, network topology, and equipment speed will determine what, if any, relation that SNR will have on throughput.

90.     Beyond these networking metrics, environmental factors may have impacts on SNR.  For example, the presence of water around a coaxial cable could impact SNR. Ex. EE (Subscriber Drop, July 1997) at 2; Ex. FF (CM-GL-PNMP-V02-110623) at 85-87. Similarly, the ambient heat surrounding a cable could impact SNR, because heat adds energy, which appears as noise, and also because heat can change the effective length of the cable.  *See* Ex. FF (CM-GL-PNMP-V02-110623) at 13, 52-53.  Similarly, the ambient heat in a subscriber's home, or the heat within the cable modem itself can impact SNR.  But for each of these environmental factors, numerous additional factors will determine whether a change in the metric actually affects SNR.  The '682 patent provides no guidance on whether such variables, which may or may not affect SNR in practice, are "SNR-related metrics" within the meaning of the patent. A person of skill in the art would thus not know whether these fall within, or outside, the scope of the claims.

91.     The specification of the '682 patent also creates further confusion regarding the boundaries of the term "SNR-related metric." For instance, it describes the distance between a cable modem and a CMTS as a "performance metric." Ex. N ('682

patent), 6:66-7:6. But it does not describe distance as an "SNR-related metric," although the distance that data is transmitted from the CMTS to the cable modem can affect SNR. Similarly, it describes the "number of coupling elements" between the CMTS and a cable modem as a "performance metric." Ex. N ('682 patent), 6:46–61. But it does not describe the "number of coupling elements" as an "SNR-related metric," even though the specification itself acknowledges that the "number of coupling elements" may impact SNR. Ex. N ('682 patent), 6:46–61 ("e.g., the extra device in the path between CMTS 102 and CMs $111_2$ and $112_3$ may cause CMs $112_2$ and $112_3$ to have significantly poorer SNR"). As a result, a person of ordinary skill in the art cannot determine whether other environmental conditions that impact SNR, such as moisture or heat, are "SNR-related metrics" or not. There is no disclosure regarding how much correlation must exist between a metric and SNR for it to be an "SNR-related metric," and this disclosure simply creates confusion regarding the outer bounds of the term "SNR-related metric."

92.     For the above discussed reasons, it is my opinion that a person of ordinary skill in the art at the time of the alleged invention would not understand the bounds of an "SNR-related metric," and that the term is therefore indefinite.

_____

Sandeep Chatterjee, Ph.D.